UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

REGINALD J. IRWIN, JR,

     Plaintiff,

v.                              Case No. 3:21cv726-MCR-HTC

KELLY M. KELLY, et al.,

     Defendants.

_____/

<u>REPORT AND RECOMMENDATION</u>

Plaintiff Reginald J. Irwin, Jr., a former prisoner proceeding *pro se* and *in forma pauperis*, filed a complaint under 42 U.S.C. § 1983, alleging the Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment.  ECF Doc. 1.  Defendants have moved for summary judgment.  ECF Doc. 66.  Upon consideration of the motion and the relevant law, as well as the documents submitted by Plaintiff, ECF Doc. 68, the undersigned recommends the motion be GRANTED.

**I.    LEGAL STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he mere existence of *some* alleged factual

dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law, and it is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* The Court must review the evidence, and all factual inferences reasonably drawn from the evidence, "in the light most favorable to the non-moving party." *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir. 1993) (citation omitted). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1534 (11th Cir. 1992) (citation omitted).

## II.    BACKGROUND AND FACTS

Plaintiff was an inmate housed at Santa Rosa Correctional Institution ("SRCI") when the events giving rise to this lawsuit took place. He sues four Defendants: (1) Kelly M. Kelly, RN; (2) Sheila Melvin, APRN; (3) Administrator Kady Hall; and (4) Centurion of Florida, LLC ("Centurion"). The crux of Plaintiff's complaint is that the Defendants failed to provide him with adequate care for issues he experienced with his left leg—first, by requiring him to wear standard prison-issued "Crocs" instead of giving him shoes, which he suggests made him more

susceptible to falling, and second, by failing to provide sufficient treatment for an ankle injury he sustained after falling on March 22, 2019. The following relevant facts are undisputed and will be supplemented as necessary in the Discussion section:[1]

Plaintiff entered FDOC custody in December 2014 with a "Health Problem List" which included hypertension, chronic obstructive pulmonary disease, and asthma. ECF Docs. 1 at 6; 66-1. Plaintiff also contends his sciatic nerve, lower back, left foot and left leg "were damaged." ECF Doc. 1 at 6.

Plaintiff was transferred to SRCI in July 2018.[2] A Disabled Inmate Management and Service Plan, completed on July 19, 2018, indicated Plaintiff had peripheral neuropathy and a pass for a rolling walker. ECF Doc. 66-2.

Nurse Melvin examined Plaintiff on July 26, 2018. ECF Doc. 68 at 42. She noted Plaintiff was "currently using [a] walker for sciatica and 'peripheral neuropathy.'" *Id.* at 43. Plaintiff requested a rollator and Melvin referred him to a physical therapist to determine an "appropriate mobility device/restrictive activities." *Id.* at 42-43. Melvin also discontinued his prescriptions for Motrin, Zantac, and allergy medication after noting his sinusitis had resolved and informing

---

[1] These facts are taken from the complaint, which Plaintiff signed under penalty of perjury, and the documents submitted by the parties.

[2] In the complaint, Plaintiff identifies 2017 as the date he went to SRCI, but the record clearly shows he was not transferred there until 2018.

him that "excessive daily doses of Motrin can exacerbate GERD symptoms." *Id.* at 42. Instead, Melvin prescribed him Mobic and a nasal saline spray. *Id.*

The physical therapist, N. Sanders, evaluated Plaintiff on August 7, 2018. ECF Doc. 68 at 44. PT Sanders noted Plaintiff already had the rollator and had "walked out of his shoes and was unaware." *Id.* After examining Plaintiff, Sanders recommended continued use of the rollator, a "sneaker pass for ambulation except for showering," and a "follow up [with] physical therapy in 4 weeks." *Id.* However, Nurse Quinn and Defendant Nurse Melvin found a "soft shoe pass [was] not indicated" and he did not need a pass to wear soft shoes. *Id.*

On August 7, 2018, Plaintiff filed a grievance seeking an evaluation from a doctor and the restoration of his discontinued medication "without paying another sick call." ECF Doc. 66-3. The grievance was denied; he was advised that pain relief medications were available in the dorm and if he sought further evaluation, he needed to follow the sick-call process. *Id.*

On August 24, 2018, Plaintiff submitted a grievance complaining that the saline nasal spray he was given was nothing more than a "salt" solution that did "nothing for allergies or [to] help for nose bleeds." ECF Doc. 66-6. He also complained about the prescriptions written by Nurse Melvin and requested the return of his allergy medication. *Id.* The grievance was denied; the response noted

Melvin's July 26, 2018 examination showed Plaintiff's sinusitis had resolved and to return to sick call if necessary.  ECF Doc. 66-5.

On September 14, Plaintiff made a pass request to Nurse Melvin, who determined there was no indication for single bunk, no sports, or no work outdoors passes, but he could have low bunk and tinted glasses passes.  ECF Doc. 68 at 38. Thus, as of October 23, 2018, Plaintiff had rollator, low bunk/tier, eye patch, key lock, and tinted glasses passes.  ECF Doc. 66-7.  Plaintiff complained in a September 24, 2018 grievance, however, that he still needed passes for sunglasses, a single bunk, no sports and no work outdoors due to depth perception and light sensitivity issues.  ECF Doc. 66-8.  Plaintiff's grievance was denied because there was no clinical indication for the requested passes.  *Id.*

PT Sanders saw Plaintiff on October 9 and 23, and recommended shoes "to protect his feet from possible injury due to balance issues, visual field issues, [and] neuropathy" in his feet.  ECF Docs. 66-10 at 2; 68 at 14-15.  On October 25, 2018, Nurse Melvin noted that Plaintiff did not meet the FDOC Health Services Bulletin ("HSB") standard for therapeutic shoes and an appointment was pending with a clinician to discuss the issue.  ECF Doc. 68 at 8, 15.

On November 8, 2018, Plaintiff submitted a grievance complaining about not getting the shoes he had been told were approved by a doctor.  ECF Doc. 66-10 at 2. According to the grievance, PT Sanders told Plaintiff "he believed the order had

been stopped." *Id.*  The grievance was denied because Plaintiff's "file was reviewed by the provider" and he did "not meet the HSB standard for therapeutic shoes."  ECF Doc. 66-10 at 1.

On November 27, 2018, PT Sanders noted Plaintiff was "now a fall risk due to left lower extremity weakness" and recommended a wheelchair for "fall prevention."  ECF Doc. 68 at 17.  In a follow-up on December 18, 2018, Plaintiff reported falling three times in the past two weeks; Sanders indicated the wheelchair had been ordered.  *Id.* at 18.

On January 22, 2019, Plaintiff told PT Sanders he received a wheelchair, but it did not have leg rests which caused Plaintiff to drag his left foot.[3]  ECF Doc. 68 at 10.  Plaintiff stated his back pain had decreased since being in the wheelchair and he was not having "near as many [falls] as before," with falls only occurring in the shower or during transfer.  *Id.*  PT Sanders suggested a leg rest for the left side of the wheelchair and to discontinue physical therapy.  *Id.*  Nurse Facchine issued the leg rest on January 25, 2019.  *Id.*

On January 29, 2019, Defendant Nurse Kelly noted Plaintiff needed a new wheelchair.  *Id.*; ECF Doc. 1 at 8.  On February 25, 2019, Plaintiff filed a grievance complaining that he went to sick call on February 8, but still had not received a

---

[3] Plaintiff also submitted a grievance on January 20, 2019, regarding the need for a wheelchair with a leg rest.  ECF Doc. 68 at 11.  The grievance was denied because he received new wheelchair leg rests on January 25, and a new wheelchair had also been ordered.  *Id.* at 12.

renewed wheelchair pass.  ECF Doc. 66-12 at 1.  The grievance was denied because Plaintiff had a temporary wheelchair pass and the issue would be addressed at an "upcoming clinic." *Id.*

On March 13, 2019, Plaintiff filed a grievance complaining that Nurse Melvin failed to renew his single bunk pass in September 2018.  ECF Doc. 68 at 32.  Nurse Kelly denied the grievance because "housing is assigned by classification" and Plaintiff had a low bunk/low tier pass, but his "other passes were expired and not deemed necessary." *Id.*

On March 22, 2019, Plaintiff filed a grievance complaining about not getting a sunglasses pass and a no prolonged sun pass, and not getting a prescription for his eye medication.  ECF Doc. 68 at 28.  The grievance was denied because the prescription had been processed and the passes were "not clinically indicated per DOC policy." *Id.*

Also on March 22, 2019, Plaintiff fell and injured his left foot.  In an April 11, 2019 grievance—his earliest description of the incident—Plaintiff stated he "went to stand up in the bathroom and [his] left foot folded under and [he] fell." ECF Doc. 66-14 at 2.  However, in a later sick-call request and in the complaint, Plaintiff alleges he fell while walking behind his wheelchair.  ECF Docs. 1 at 8; 68 at 7.

After falling on March 22, Plaintiff visited medical to pick up a temporary wheelchair pass; Nurse Facchine looked at Plaintiff's swollen ankle and "showed concern" until she learned Plaintiff was there for a pass. ECF Doc. 1 at 8. Nurse Facchine refused to classify Plaintiff's foot injury as a "medical emergency due to it not being life threatening or bleeding," and told him he needed to submit a sick-call request for treatment. *Id.* at 9. Plaintiff submitted a sick-call request and was seen on March 23 by Nurse Facchine, who treated him for a sprain with an Ace bandage. *Id.*; ECF Doc. 1 at 2-3.

On March 24, 2019, Plaintiff filed a grievance complaining about being denied medical therapeutic shoes, which he contends caused his March 22 ankle injury. ECF Doc. 66-15 at 2. Plaintiff filed a grievance on March 27, 2019, asking for restoration of his single bunk, sunglasses, no prolonged sun, and no sports passes. ECF Doc. 68 at 29. Both grievances were denied because the passes Plaintiff requested had not been issued by a provider.[4] ECF Docs. 66-15 at 1; 68 at 30.

---

[4] On April 10, Plaintiff filed an appeal to the Secretary complaining generally about how he did not have the same passes he had before he transferred to SRCI. ECF Doc. 68 at 21. The appeal was denied with the response noting medical staff were responsible for determining the appropriate passes, inmates could not dictate how medical passes are prescribed, and Plaintiff was scheduled to see a physician soon. *Id.* at 22. Plaintiff submitted a similar grievance to the warden on April 16, 2019, this time seeking compliance with ADA provisions. *Id.* at 23. The grievance was denied because the eye doctor who evaluated Plaintiff in September 2018 and March 2019 determined tinted glasses were not necessary; the doctor did indicate Plaintiff should avoid prolonged sun exposure, but he did not issue a pass for that purpose and Plaintiff had access to porticos on the recreation yard. *Id.* at 24.

On April 18, 2019, Plaintiff submitted a formal grievance complaining about not seeing a doctor to go over the results of blood draws from January 30 and April 8 of 2019. ECF Doc. 68-1 at 32. Plaintiff requested the "medical department and staff be instructed to be more prompt in responding to inmate needs and medications." *Id.* The grievance was denied because Plaintiff's blood work was normal and, thus, a follow up appointment was not needed. *Id.* at 28. Plaintiff appealed the denial of that grievance, *id.* at 29-30, and the appeal was denied with a note that Plaintiff had a chronic illness clinic appointment scheduled and could access sick call to address any medical concerns, *id.* at 31.

On April 11, 2019, Plaintiff filed a grievance complaining that it had been "20 days since [his March 22] fall and medical refuses to do a follow-up for x-rays or to see a doctor." ECF Doc. 66-14 at 2. Plaintiff felt the injury should have been immediately treated as a medical emergency, which would not have resulted in a charge to his account. *Id.* The grievance was denied, with the response noting Plaintiff's injury was treated on March 23 and he had not returned to sick call with complaints of foot pain. *Id.* at 1.

When Plaintiff went to medical to pick up a new eye patch on April 21, 2019, Nurse Facchine and Nurse Davis asked about his swollen ankle. ECF Doc. 1 at 9. Plaintiff reminded Nurse Facchine she refused to treat it on the day the injury happened and, although she denied knowledge of that, both nurses told Plaintiff to

make another sick call and that x-rays should have been done. *Id.* Plaintiff filed a grievance the following day, April 22, based on his interaction with the nurses and asked "to be seen by a competent physician to receive immediate medical treatment for the injury to [his] left foot including x-rays." ECF Doc. 68 at 1. The grievance and subsequent appeal, *id.* at 5-6, were denied because Plaintiff was seen by medical on March 23, 2019, given an Ace wrap, and instructed to return to sick call if the pain continued, *id.* at 3-4. None of the Defendants were involved with the denial of the grievance or the appeal.

On July 4, 2019, Plaintiff submitted a sick-call request, complaining about pain and swelling to his foot from the fall. ECF Doc. 68 at 7. On July 7, 2019, Plaintiff was admitted to the infirmary to evaluate swelling in his left leg and a potential deep vein thrombosis ("DVT"). ECF Doc. 68-1 at 20-26. Nurse Melvin ordered an x-ray of Plaintiff's left ankle, which was completed on July 10 and showed no fracture or dislocation and unremarkable soft tissues. *Id.* at 18, 23. A venous doppler test completed on July 16, 2019, showed an acute DVT in the left lower extremity. *Id.* at 19. Plaintiff consented to treatment for the DVT on September 5, but then four days later refused all such treatment. ECF Docs. 66-19; 66-20; 68 at 8.

On July 28, 2019, Plaintiff submitted a formal grievance to the warden complaining about Nurse Kelly's response to an informal grievance and asking to

be assigned an inmate pusher.  ECF Doc. 68-1 at 1-2.  Kelly denied the informal grievance because she was waiting on an optometrist evaluation and the formal grievance was denied because there was no medical indication Plaintiff needed a pusher.  *Id.* at 2-3.  Plaintiff appealed the denial to the Secretary.  *Id.* at 4-5.  The appeal was granted, and Plaintiff was approved for an inmate pusher.  *Id.* at 6.

On November 7, 2019, Nurse Melvin saw Plaintiff and noted he was "argumentative," "refused to answer questions, [and] became upset when attempting to discuss optometrist recommendations for [a] retinal specialist."  ECF Doc. 66-21.  Plaintiff stated he was "not going to see a specialist" and would "see a real doctor" when he was released from prison.  *Id.*  He also refused to discuss the DVT, stating "you made that up, I twisted my ankle and [you're] making up a DVT."  *Id.*  Nurse Melvin dismissed Plaintiff due to his "increased agitation" and indicated she would refer him to mental health for evaluation.  *Id.*

On January 8, 2020, Nurse Coulter referred Plaintiff to physical therapy to assist with strength training to restore ambulation.  ECF Doc. 68-1 at 7.  Because Plaintiff's DVT had resolved,[5] there was no need for a wheelchair and Nurse Coulter was concerned about muscle atrophy and possible DVT formation if Plaintiff remained in the wheelchair.  *Id.*

---

[5] A venous doppler test from November 25, 2019, showed the DVT had resolved.  ECF Doc. 68-1 at 7.

On January 14, 2020, Plaintiff was seen by PT Sanders and then subsequently by Nurse Melvin, who reviewed Sanders' notes.  ECF Doc. 68 at 8.  Melvin noted Sanders found Plaintiff was unable to stand due to pain and weakness in his left leg; Sanders recommended a neurological consult, but Plaintiff did not want to go to the Reception and Medical Center.  *Id.*  Melvin discussed Plaintiff's case with Dr. Hernandez, who indicated medical shoes were not necessary and that shoes would be considered if Plaintiff required a brace for the left foot drop.  *Id.*

On January 23, 2020, Plaintiff refused a therapeutic shoe for his left foot.  ECF Doc. 66-22.  Medical records also indicate Plaintiff would not agree to a neurology consult and he should take Tylenol or Motrin as needed for lower extremity pain. ECF Doc. 68-1 at 10.

On February 14, 2020, Plaintiff received a new "drive" wheelchair.  ECF Doc. 68 at 9.  A Disabled Inmate Management and Service Plan completed on July 21, 2021, showed Plaintiff had the following passes: wheelchair, left eye patch, low bunk, low tier, T.E.D.[6] hose, and pusher.  ECF Doc. 66-23.  The Plan noted that a pusher needed to be assigned by classification, Plaintiff's wheelchair needed its brakes tightened, and he needed a new wheelchair.  *Id.*

After Plaintiff was transferred to Graceville Correctional Facility, x-rays taken of his left ankle on November 2, 2021, showed: "The alignment is normal.

---

[6] Thrombo-Embolic Deterrent hose

There is no fracture or dislocation.  The joints appear well maintained.  Mild soft tissue swelling."  ECF Doc. 66-24.  Plaintiff was released from FDOC custody on September 28, 2022.

## III.   DISCUSSION

### A.   Deliberate Indifference Standard

Prison officials violate the Eighth Amendment when they act with deliberate indifference to an inmate's serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976); *see also Harris v. Thigpen*, 941 F.2d 1495, 1504 (11th Cir. 1991) ("Federal and state governments . . . have a constitutional obligation to provide minimally adequate medical care to those whom they are punishing by incarceration.").  However, the Supreme Court has emphasized that not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment."  *Estelle*, 429 U.S. at 105.

To prevail on a deprivation of medical care claim, a plaintiff "must show: (1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury."  *Mann v. Taser Int'l, Inc*., 588 F.3d 1291, 1306-07 (11th Cir. 2009).  A serious medical need is "one that, if left unattended, poses a substantial risk of serious harm."  *Id.* at 1307 (quoting *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003)).  For a defendant to have acted with deliberate indifference to that need, a plaintiff must prove: "(1) subjective

knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence." *Goodman v. Kimbrough*, 718 F.3d 1325, 1331-32 (11th Cir. 2013) (quoting *Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1158 (11th Cir. 2010)). To have subjective knowledge, the defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Deliberate indifference requires more than "merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law." *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (citation and quotations omitted). Prison officials may avoid Eighth Amendment liability by showing, for example: (1) "that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger"; (2) "they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent"; or (3) "they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

### B.    Failure to Provide Sneakers

Plaintiff faults Defendants for failing to give him soft shoes instead of Crocs after he arrived at SRCI in 2018. However, even assuming Plaintiff's peripheral

neuropathy qualifies as a serious medical need, Plaintiff has not established Defendants exhibited deliberate indifference to that need by failing to provide him with shoes in 2018 and 2019.

When Nurse Melvin first examined Plaintiff on July 26, 2018, he was using a walker but requesting a rollator, ECF Docs. 66-2; 68 at 42, and Melvin referred him to a physical therapist to evaluate his mobility needs, ECF Doc. 68 at 42-43. Although PT Sanders recommended a rollator for mobility and a sneaker pass for ambulation in August 2018, Plaintiff did not receive the shoes, with Melvin noting "soft shoe pass not indicated – does not require pass."[7] ECF Doc. 68 at 44. After PT Sanders recommended shoes again in October 2018 "to protect [Plaintiff's] feet from possible injury," *id.* at 14-15, Melvin explained that Plaintiff "was denied medical shoes because he did not meet requirements for medical shoes," but he could purchase his own tennis shoes through the canteen, *id.* at 8, 15.

When Plaintiff saw PT Sanders on November 27, 2018, he began reporting falls. ECF Doc. 68 at 17. Sanders concluded Plaintiff "is now a fall risk due to left lower extremity weakness" and recommended a wheelchair for fall prevention. *Id.* In a December 18, 2018 follow-up, Plaintiff reported three additional falls in the previous two weeks; PT Sanders noted a wheelchair had been ordered and the plan was to "continue to monitor" and have another follow-up in six weeks. *Id.* at 18.

---

[7] Inmates "do not require [a] pass for soft shoe[s]." ECF Doc. 68 at 41.

Plaintiff filed a grievance on December 20, 2018, asking when he would receive a wheelchair; Nurse Kelly responded, telling him she would "check on back order." *Id.* at 13, 19. Plaintiff received a wheelchair on January 18, 2019, *id.* at 8, 11, and, thus, had access to one at the time he injured his ankle on March 22, 2019.

Based on the foregoing, Plaintiff has not presented evidence showing Defendants exhibited deliberate indifference to the issues with his left foot before March 22, 2019, or that the alleged indifference caused his ankle injury on March 22. First, Defendants make the unrebutted argument that they were not responsible for Plaintiff's inability to obtain shoes and Plaintiff's dispute should be directed to the FDOC and its policy. FDOC HSB No. 15.03.25.02 states that soft shoes: (1) "are typically defined as tennis shoes, sneakers, running shoes, and athletic shoes"; and (2) "are not to be issued by medical unless the shoes are to be used with a specific orthotic device" such as a heel or arch insert.[8] Because FDOC policy prohibited Defendants from following PT Sanders' recommendation that Plaintiff be issued sneakers without an orthotic device, their failure to do so cannot qualify as deliberate indifference and certainly does not exhibit a "sufficiently culpable state of mind." *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1191 (11th Cir. 1994).

---

[8] Defendants submitted a copy of HSB No. 15.02.02, which is titled "Health Care Clearance/Holds" and establishes "guidelines regarding the use and clearance of medical holds, in [an] effort to ensure the continuity of health care for inmates scheduled to transfer." ECF Doc. 66-26. HSB No. 15.02.02 is not relevant to the issues before the Court, as it does not describe the FDOC policies related to the issuance of shoes to inmates. All FDOC HSBs can be found at: http://dc.state.fl.us/business/Health/bulletins.html.

Second, even assuming Defendants were not subject to the FDOC HSB or could have overridden it, the evidence does not support a finding of deliberate indifference. Although PT Sanders noted Plaintiff had issues with his left leg, had "walked out of his shoes and was unaware," and recommended shoes to protect his feet from possible injury, this evidence is not sufficient to show Defendants were subjectively aware that a failure to give Plaintiff sneakers created a substantial risk of him falling, particularly considering Plaintiff's use of a rollator and, later, a wheelchair.[9]

In addition, in July 2018, Nurse Melvin examined Plaintiff and observed him "ambulate to medical [with] no obvious gait abnormality." ECF Doc. 68 at 42. If Melvin disagreed with PT Sanders' recommendation that Plaintiff be provided shoes, that is simply a difference in medical opinion between two providers which does not constitute deliberate indifference. *See Fischer v. Fed. Bureau of Prisons*, 349 F. App'x 372, 375 (11th Cir. 2009) ("Evidence of potential error in [doctor's] medical judgment, or a difference in medical opinion from another doctor, did not create a genuine issue of material fact because it did not demonstrate action beyond gross negligence.") (citations omitted); *Bismark v. Fisher*, 213 F. App'x 892, 896-

---

[9] Indeed, in a November 18, 2018 grievance, Plaintiff stated PT Sanders recommended the shoes because Plaintiff kept stubbing his left foot and toes and Sanders was "afraid [he] might break them and not know it." ECF Doc. 66-10 at 2. Thus, the evidence suggests the primary basis for the shoe recommendation was a concern for protecting Plaintiff's foot from an impact injury, rather than preventing a fall and twisted ankle like the one suffered on March 22, 2019.

97 (11th Cir. 2007) (finding no deliberate indifference where doctor who observed prisoner's feet and gait disagreed with outside podiatrist's prescription of special shoes). Furthermore, Melvin noted Plaintiff could purchase tennis shoes through the canteen. *See Bismark*, 213 F. App'x at 897 ("The only aspect of Dr. Fisher's diagnosis, treatment or recommendation with which Bismark takes issue is that Dr. Fisher would have him buy the sneakers himself, instead of receiving them for free. That is not the stuff of deliberate indifference, absent a showing that Dr. Fisher's determination that such shoes were not medically necessary was anything more than negligent."). And when Plaintiff was ultimately offered a therapeutic shoe for his left foot on January 23, 2020, he refused it.[10]  ECF Doc. 66-22.

Finally, it is not clear Plaintiff's lack of shoes even caused his ankle injury on March 22, 2019. On April 11, 2019, Plaintiff filed a grievance stating that on March 22 he "went to stand up in the bathroom and [his] left foot folded under and [he] fell"; the grievance did not mention Crocs as a contributing cause to the fall. ECF Doc. 66-14 at 2. If that description of the fall is true, Plaintiff has failed to establish causation between the lack of shoes and his injury, since common sense indicates -- and Plaintiff does not dispute -- that his foot would have "folded under" regardless

---

[10] The only allegation against Defendant Hall is that on November 9, 2018, and January 15, 2019, she denied grievances Plaintiff submitted about obtaining shoes, stating he did not qualify. ECF Docs. 1 at 8; 68 at 16, 19. However, there is no evidence showing Hall was subjectively aware that failing to provide Plaintiff shoes created a substantial risk of him falling. Therefore, Plaintiff has not met the elements of a deliberate medical indifference claim against Hall.

of whether he was wearing shoes or Crocs.  Moreover, Plaintiff was provided a wheelchair to prevent his falls.

### C.   Treatment of Ankle Injury

Plaintiff has also not shown the treatment Defendants Kelly, Melvin, and Hall provided for his March 22, 2019 ankle injury violated the Eighth Amendment. Plaintiff first takes issue with the treatment he received immediately following the injury, suggesting it should have been classified as a medical emergency, which he says would have made it unnecessary to seek treatment through the sick-call process. ECF Doc. 1 at 8-9; ECF Doc. 68 at 6.  However, Nurse Facchine (who is not a Defendant) was the individual who: (1) told Plaintiff on March 22 to sign up for sick call; and (2) treated Plaintiff's ankle on March 23 by wrapping it with an Ace bandage.  ECF Doc. 1 at 8-9; ECF Doc. 68 at 2-3.  Because none of the individual Defendants were responsible for the initial assessment and treatment of Plaintiff's ankle injury, those interactions cannot provide a basis for an Eighth Amendment claim against them.

Similarly, Plaintiff alleges in his complaint that in May, June, August, September, and October of 2019, he submitted sick-call requests about the pain and swelling in his ankle and foot, but he received "no treatment."  ECF Doc. 1 at 9-10. However, Plaintiff does not identify who saw him at these sick calls, and the record does not contain: (1) the sick-call requests; (2) medical chart entries documenting

the sick calls; or (3) grievances discussing Plaintiff's dissatisfaction with the results of sick calls during these months.[11]   Because there is no evidence any of the individual Defendants saw Plaintiff at these sick calls or were even aware of them, they do not support a finding that the Defendants acted with deliberate indifference to his ankle injury.  *See Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008) (noting "imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference" and "[e]ach individual Defendant must be judged separately and on the basis of what that person knows").

Turning to the evidence which does reference the Defendants, in an April 11, 2019 formal grievance about the treatment for his ankle injury, Plaintiff mentioned Nurse Kelly responded to an informal grievance about the same issue and told him he needed to access sick call for treatment.  ECF Doc. 66-14 at 2.  Although Plaintiff believed he should not be required to submit a sick-call request to receive additional treatment or x-rays, *id.*, Nurse Kelly's directive that he seek care for a not-life-threatening ankle injury through the proper channels does not show deliberate indifference.  *See Milton v. Turner*, 445 F. App'x 159, 165 (11th Cir. 2011) (finding official telling prisoner to go to sick call after prisoner reported being injured was not conduct amounting to more than gross negligence).

---

[11] The record does reflect Plaintiff refused a sick call on August 14, 2019.  ECF Docs. 66-17; 68-1 at 27.

Nurse Melvin's first encounter with Plaintiff regarding his ankle stemmed from a July 4, 2019 sick-call request in which Plaintiff complained of swelling and pain in his left ankle and foot. ECF Doc. 68 at 7. After Plaintiff was admitted to the infirmary, Melvin physically examined him on July 8, noting moderate edema in his lower left leg, ankle, and foot. ECF Doc. 68-1 at 22. Melvin and other staff members scheduled two diagnostic tests to evaluate whether he had a fracture or DVT. *Id.* at 20, 23-26. Furthermore, as a precaution, Melvin tried to give Plaintiff Lovenox and Coumadin to treat a DVT until the condition could be ruled out, but he refused it. *Id.* at 20.

The July 10 x-ray showed no fracture or dislocation, and the soft tissues were unremarkable.[12] ECF Doc. 68-1 at 18. The July 16 venous doppler report showed an acute DVT in Plaintiff's lower left leg. *Id.* at 19.

On September 5, 2019, Nurse Melvin reviewed the results of the venous doppler report, ECF Doc. 68-1 at 19, and obtained Plaintiff's consent to treat the DVT with Lovenox and Coumadin, ECF Doc. 66-19, the same medication Plaintiff had previously refused. On the same day, Plaintiff refused a neurological consultation to evaluate his neuropathy. ECF Doc. 66-18.

---

[12] X-rays of the left ankle taken in January 2021 and November 2021 also showed soft tissue swelling but no fracture or dislocation. ECF Docs. 66-24; 66-25.

On September 9, Plaintiff refused treatment for the DVT and on November 7, 2019, when Melvin attempted to discuss the DVT, Plaintiff stated: "You made that up, I twisted my ankle and [you're] making up a DVT."  ECF Docs. 66-20; 68 at 8; 68-1 at 16.  After a November 25, 2019 ultrasound showed the DVT had resolved, Plaintiff was referred back to physical therapy to try to get him out of the wheelchair and prevent further DVT development.  ECF Docs. 68 at 8; 68-1 at 7.  PT Sanders found Plaintiff was unable to stand due to pain and weakness in his left leg and recommended a neurological consultation, but Plaintiff did not want to go to the Reception and Medical Center for the consultation.  ECF Doc. 68 at 8.

None of this evidence suggests Nurse Melvin exhibited deliberate indifference to Plaintiff's condition following his March 22, 2019 ankle injury.  To the contrary, it shows she physically examined Plaintiff, ordered diagnostic testing to learn more about his condition, and offered him treatment and a neurological consultation to evaluate his neuropathy, which Plaintiff refused.[13]  Although Plaintiff is dissatisfied with Melvin and the care he received after March 22, 2019, neither the complaint nor the response to the motion for summary judgment even hint at what treatment

---

[13] Plaintiff contends the fact that Melvin did not review the DVT results until September is an example of deliberate indifference.  The undersigned disagrees.  Plaintiff's complaint is not based on a failure to treat the DVT and the evidence shows: (1) no deleterious effect from the delay; (2) even after the results were reviewed, Plaintiff was skeptical he had a DVT and accused Melvin of "making it up"; and (3) he refused most, if not all, treatment for the DVT, both before and after the test.  And since the evidence does not show Melvin was the clinician tasked with reviewing the results, or that Plaintiff asked any clinician about the results between July and September, Melvin's failure to promptly review the results was, at worst, negligent.

Plaintiff believes was medically necessary but not provided or offered.  Accordingly,

Plaintiff has not demonstrated the care he received after injuring his ankle on March

22, 2019, violated the Eighth Amendment.  *See Harris v. Thigpen*, 941 F.2d 1495,

1505 (11th Cir. 1991) ("Medical treatment violates the eighth amendment only when

it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or

to be intolerable to fundamental fairness.'") (quoting *Rogers v. Evans*, 792 F.2d

1052, 1058 (11th Cir. 1986)).

### D.    Medication and Passes

To the extent Plaintiff alleges Nurse Melvin's discontinuation of his

medication violated the Eighth Amendment, ECF Doc. 1 at 6, he has failed to present

evidence showing her conduct amounted to deliberate indifference.  In July 2018,

Melvin discontinued Plaintiff's prescriptions for Motrin, Zantac, and allergy

medication after noting his sinusitis had resolved and that "excessive daily doses of

Motrin can exacerbate GERD symptoms."  ECF Doc. 68 at 42.  Instead, Melvin

prescribed him Mobic and a nasal saline spray.  *Id.*

Discontinuing a medication because of its side effects, or because a clinician

concludes a condition has abated and medication is no longer necessary, is a matter

of medical judgment which does not constitute deliberate indifference.  *See*

*Monteleone v. Corizon*, 686 F. App'x 655, 660 (11th Cir. 2017) ("[D]etermining

which medication to prescribe is generally a matter of medical judgment, and [a

prisoner is] required to do more than question [a doctor's] medical judgment to overcome a summary judgment ruling on his § 1983 claim."). Furthermore, Melvin provided alternative forms of treatment when she discontinued Plaintiff's preferred medications. Thus, Plaintiff has not established Melvin violated the Eighth Amendment by changing his medication regimen.

The evidence submitted by the parties also includes grievances Plaintiff submitted which complain about Defendants' failure to provide him with passes for a single bunk, sunglasses, no sports, no work outdoors, and no prolonged sun exposure. Plaintiff's complaint, however, does not contain any allegations regarding these passes and, thus, they do not form the basis of his Eighth Amendment claim.

Furthermore, although Plaintiff claimed he needed a single bunk pass due to the possibility he could hit his head on a top bunk, ECF Doc. 68 at 32, the evidence does not show the denial of such a pass caused Plaintiff any injury. *See Milton*, 445 F. App'x at 162 (finding prisoner failed to allege defendants' indifference to his low blood sugar caused any injury and, at most, he alleged he was afraid something would happen to him).

And the denial of the other passes, which were all related to Plaintiff's alleged sensitivity to sunlight, does not constitute deliberate indifference. Medical providers found Plaintiff's preferred passes were not clinically indicated, and Plaintiff was provided with a pass for tinted glasses, ECF Doc. 66-7, and had access to porticos

on the recreation yard to protect him from sun exposure, ECF Doc. 68 at 24. Plaintiff also refused to see a retinal specialist. ECF Doc. 68-1 at 16. Thus, Plaintiff has not established Defendants' denial of certain passes violated the Eighth Amendment.

### E.    Centurion

Plaintiff also seeks to hold Centurion—the corporation responsible for providing medical care to inmates at SRCI—liable for an Eighth Amendment violation. "[T]o impose § 1983 liability on a [corporation], a plaintiff must show: (1) that his constitutional rights were violated; (2) that the [corporation] had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) (citation omitted). Plaintiff has not made this showing for two reasons.

First, because Plaintiff has failed to present evidence that the medical care he received violated his constitutional rights, Centurion cannot be held liable for causing such a violation, regardless of any custom or policy it may have. *See Ross v. Corizon Med. Servs.*, 700 F. App'x 914, 917-18 (11th Cir. 2017) ("[B]ecause Mr. Ross has not demonstrated that there was a constitutional violation in this case, by extension, he cannot establish that Corizon participated in or caused such a violation.") (citation omitted); *Palermo v. Corr. Med. Servs. Inc.*, 133 F. Supp. 2d 1348, 1363 (S.D. Fla. 2001) ("It almost goes without saying that there can be no

custom of deliberate indifference to a Plaintiff's Constitutional rights for those Plaintiffs who have not suffered a Constitutional tort.").

Second, even if Plaintiff had established that his medical care violated the Constitution, he has not presented evidence showing such conduct was caused by a custom or policy of Centurion. Plaintiff's complaint is littered with conclusory allegations that the decisions of SRCI medical providers were influenced by Centurion policy. *See e.g.*, ECF Doc. 1 at 6 (alleging Melvin suspended his medication "per policy, practice, and custom of Centurion"); *id.* at 7 (alleging that Kelly and Melvin's failure to follow Sanders' recommendation for shoes "was pursuant to Centurion's policy of denying Irwin's medical care to save money and to appease biased security staff"); *id.* at 9 (alleging Facchine did not classify Plaintiff's ankle injury as a medical emergency or provide additional treatment per policy of Centurion). However, these allegations fail to describe what the relevant policies are or how they affected Plaintiff's treatment. And conclusory allegations regarding an entity's policy—with no evidence to support the existence thereof— are not enough to survive summary judgment. *See Johnson v. Darnell*, 781 F. App'x 961, 964 (11th Cir. 2019) ("allegations that [sheriff's deputies] acted according to a policy or custom of deliberate indifference to constitutional rights are too conclusory to plausibly state a claim") (citation omitted); *see also Winslow v. Prison Health Servs.*, 406 F. App'x 671, 674 (3d Cir. 2011) ("[T]he naked assertion that Defendants

considered cost in treating [Plaintiff's] hernia does not suffice to state a claim for deliberate indifference, as prisoners do not have a constitutional right to limitless medical care, free of the cost constraints under which law-abiding citizens receive treatment.").

Moreover, the fact medical providers at SRCI offered Plaintiff a variety of passes, assistive devices, and treatment—including the shoes he was initially denied—suggests his inability to obtain his preferred accommodations and treatment was not due to a Centurion policy but was instead the product of medical judgment. Thus, Centurion is entitled to summary judgment on Plaintiff's Eighth Amendment claim.

## IV.    CONCLUSION

Accordingly, it is RECOMMENDED:

1.    That Defendants' motion for summary judgment, ECF Doc. 66, be GRANTED.

2.    That the clerk be directed to enter judgment in favor of Defendants and close the file.

At Pensacola, Florida, this 2nd day of March 2023.

/s/ Hope Thai Cannon
**HOPE THAI CANNON**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations must be filed within **fourteen (14) days** of the date of the Report and Recommendation. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.</u>  An objecting party must serve a copy of its objections upon all other parties.  A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1.